UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE JAMES MADISON PROJECT, *et al.*, ) <br> ) <br> *Plaintiffs*, ) <br> ) <br> v. ) <br> ) <br> U.S. DEPARTMENT OF JUSTICE, *et al.*, ) <br> ) <br> *Defendants*. ) <br> ) | Case No. 1:16-cv-227-RCL |

## MEMORANDUM OPINION

Plaintiffs James Madison Project and Ken Dilanian filed two Freedom of Information Act ("FOIA") requests with defendants U.S. Department of Justice ("DOJ") and Central Intelligence Agency ("CIA") in 2015. Defendants believe that they have met their FOIA obligations and thus request that this Court grant summary judgment in their favor. Plaintiffs believe that defendants have failed to satisfy their FOIA obligations. Upon consideration of the Motion for Summary Judgment (ECF No. 46), opposition (ECF No. 52), and reply (ECF No. 58), the Court will grant summary judgment in favor of defendants.

## BACKGROUND

In 2012, former CIA officer John Kiriakou was indicted in the Eastern District of Virginia on five criminal counts. The indictment alleged that he repeatedly disclosed classified information (including the names of covert CIA officers and their roles in classified overseas operations) to journalists and in a book that he sought to publish. The government believed that he disclosed information regarding the CIA's counterterrorism program known as the Rendition, Detention, and Interrogation Program ("RDI Program"). In exchange for all other charges being

1

dropped, Mr. Kiriakou ultimately pled guilty to violating the Intelligence Identities Protection Act by illegally disclosing the identity of a covert officer and the officer's participation in the RDI Program. On January 25, 2013, Mr. Kiriakou was sentenced to two-and-a-half years in federal prison followed by three years of supervised release.

On December 31, 2015, plaintiffs submitted two FOIA requests to the DOJ Criminal Division, Executive Office of United States Attorneys ("EOUSA"), Federal Bureau of Investigation ("FBI"), and CIA. The first request sought the following categories of information:

- Records memorializing the entirety of the [addressee's] investigation into Mr. Kiriakou's actions, including but not limited to his disclosures of information during his December 10, 2007 interview, as well as his later alleged disclosures of classified information to unauthorized third parties regarding the identities of certain CIA officers and alleged false statements during the pre-publication review process;

- Any "damage" or "harm" assessments made regarding the impact that Mr. Kiriakou's allegedly unauthorized disclosures of allegedly classified information has had upon the national security of the United States;

- Any records memorializing the extent to which, if at all, Mr. Kiriakou lawfully raised concerns within the CIA and/or to Congress prior to December 10, 2007, regarding the CIA's past use of waterboarding;

- Any documentation memorializing the extent to which Mr. Kiriakou was deemed by [the addressee] to qualify as a "whistleblower" under then-existing laws, rules and regulations with respect to any lawful disclosures of classified information encompassed by line item (3);

- Any documentation memorializing legal analyses of the viability of [taking or recommending that DOJ take] legal action against Mr. Kiriakou as a result of his allegedly unauthorized disclosures of allegedly classified information and alleged false statements, including civil and/or criminal litigation; and

- Any documentation memorializing legal analyses of the viability of [taking or recommending that DOJ take] legal action against Mr. Kiriakou for any lawful disclosures of classified information encompassed within line item (3).

ECF No. 5-3. The second request sought records "memorializing 'crime reports'" filed or received by the recipient agency, seeking "potential criminal prosecution" of Mr. Kiriakou. ECF No. 5-4.

In response to these requests, the agencies in question searched their records to find the Kiriakou investigative files in their respective systems. The government released 12 records in full or in part as well as an additional 133 pages. All other records were withheld in full, including 205 records located in CIA files, the entire FBI investigative file (except for the publicly filed complaint from the criminal case), and DOJ records of grand jury proceedings. The declarations that the government submitted articulate the bases for the agencies' decisions to withhold certain information that they believe is exempt from disclosure under FOIA Exemptions 1, 3, 5, 6, and 7(C)-(E). The government believes it fully complied with its FOIA obligations and is entitled to summary judgment. Plaintiffs concede that the agencies' searches were adequate and that Exemptions 7(D) and 7(E) were properly invoked. Plaintiffs, however, do challenge the agencies' use of Exemptions 1, 3, and 5 as grounds for withholding certain documents as well as the FBI's use of Exemptions 6 and 7(C) as grounds for categorically withholding the entire investigative file.

## LEGAL STANDARD

FOIA requires disclosure of all requested government records unless the information falls within one of FOIA's nine exemptions. 5 U.S.C. § 552; *Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011). FOIA cases are typically resolved at the summary judgment stage, with the government bearing the burden to prove that its search for the requested information was adequate and that any information it is choosing to withhold falls within an enumerated

exemption. 5 U.S.C. § 552(a)(4)(B); *King v. DOJ*, 830 F.2d 210, 217 (D.C. Cir. 1987). Summary judgment may be granted on the basis of government declarations, provided that those declarations are sufficiently detailed and are not undermined by contrary evidence or evidence of bad faith. *See Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). In the national security context, courts tend to afford the government a great deal of deference, though the ultimate responsibility of proving compliance with FOIA remains on the government. *See Ctr. For Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003).

## ANALYSIS

The Court will grant defendants' Motion for Summary Judgment. Plaintiffs do not dispute that the agencies' searches for the requested information were adequate, so that issue will not be discussed further in this Memorandum Opinion. The Court will not analyze Exemptions 7(D) or 7(E), as plaintiffs do not challenge the use of those exemptions. As explained below, the Court finds that Exemptions 1, 3, and 5 were properly invoked. Additionally, the Court finds that the FBI properly used Exemptions 6 and 7(C) as grounds for categorically withholding the entire investigative file. Finally, the Court has determined that the CIA and EOUSA satisfied their segregability obligations and will not conduct an *in camera* review.

**I. The Government Properly Invoked Exemption 1.**

Exemption 1 protects from disclosure information that is "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" so long as the information is "in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). The government has the burden to show that Exemption 1 applies, but courts do tend to defer to agencies when Exemption 1 is at issue because "the

4

Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse [e]ffects might occur as a result of public disclosure of a particular classified record." *Larson v. U.S. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009). Exemption 1's text "suggests that little proof or explanation is required beyond a plausible assertion that information is properly classified." *Morley v. Central Intelligence Agency*, 508 F.3d 1108, 1124 (D.C. Cir. 2007).

Executive Order ("E.O.") 13526 governs the classification of national security information. Agencies must meet E.O. 13526's four classification requirements in order to invoke Exemption 1: (1) an original classification authority classifies the information; (2) the U.S. Government owns, produces, or controls the information; (3) the information pertains to one of eight protected categories listed in section 1.4 of E.O. 13526; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in a specified level of damage to the national security, and the original classification authority is able to identify or describe the damages. E.O. 13526 § 1.1(a), 75 Fed. Reg. 707, 707 (Dec. 29, 2009).

Plaintiffs challenge the CIA's and DOJ's invocation of Exemption 1. For the reasons explained below, the Court finds that both agencies' validly invoked Exemption 1. The Court will therefore grant summary judgment for the defense on this issue.

### A. The CIA Properly Invoked Exemption 1.

To support its use of Exemption 1, the CIA provided a sworn declaration from Antoinette B. Shiner ("Shiner Declaration"). ECF No. 46-10. Plaintiffs challenge the invocation of Exemption 1 only in relation to intelligence activities and intelligence methods. Plaintiffs

5

expressly waive their challenge to the invocation of Exemption 1 in relation to covert personnel, classified contracts, and locations of agency facilities.

Plaintiffs object to the CIA using Exemption 1 to withhold entire documents, claiming that such withholding is overbroad. The agency's burden, however, is merely to explain how the information being withheld "logically falls within the claimed exemption." *Casey*, 656 F.2d at 738. An agency's description is sufficient as long as it provides the information necessary to understand the "context" of its decisions regarding redaction or a "functional description" of the documents at issue. *Brick v. U.S. Dep't of Justice*, 293 F. Supp. 3d 9, 11 (D.D.C. 2017). Upon review of the Shiner Declaration, the CIA has provided sufficient information to justify its use of Exemption 1. The documents at issue concern the CIA's identification and investigation of unauthorized disclosures of classified information by a former CIA officer as well as the CIA's internal discussions and consultation with other agencies and agency components regarding the investigation and Mr. Kiriakou's ultimate arrest and prosecution. The intelligence activities, sources, and methods that the CIA withheld from these documents include counterintelligence investigation sources and techniques used to investigate the potential unauthorized disclosures, sensitive technical collection procedures used to conduct the investigation, and other information about CIA intelligence operations. Forcing the CIA to produce this information would mean forcing it to publicize details of certain CIA counterterrorism operations and other intelligence activities conducted abroad that are still classified. Therefore, this information is protected under Exemption 1.

**B. DOJ Properly Invoked Exemption 1.**

Three DOJ components—the FBI, EOUSA, and NSD—have invoked Exemption 1 in some capacity. To support their use of Exemption 1, each agency component submitted a sworn

declaration. The FBI submitted the sworn declaration of David M. Hardy (ECF No. 46-9), EOUSA submitted the sworn declaration of Princina Stone (ECF No. 46-4), and NSD submitted the sworn declaration of Patrick N. Findlay (ECF No. 46-3). Plaintiffs claim that these declarations fail to clarify how each DOJ component is construing the concept of intelligence activities, sources, and methods. They accuse the declarants of using vague and conclusory language. The Court disagrees for the same reasons outlined above in explaining why the CIA properly invoked Exemption 1. Furthermore, even if Exemption 1 did not apply, additional exemptions analyzed below provide DOJ with an adequate basis for withholding this information, thus rendering further discussion of DOJ's use of Exemption 1 unnecessary.

## II. Exemption 3

Exemption 3 allows an agency to withhold information prohibited from disclosure under another federal statute so long as the federal statute either: (a) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (b) establishes particular criteria for withholding or refers to particular types of matters to be withheld. 5 U.S.C. § 552(b)(3). In this case, the CIA withheld information under Exemption 3 in conjunction with two statutes. First, the CIA relied upon the Central Intelligence Act of 1949 ("the CIA Act"). Second, the CIA relied upon the National Security Act of 1947 ("the NSA Act"). Plaintiffs concede that as a threshold matter, both of these statutes work in conjunction with Exemption 3; however, plaintiffs argue that the CIA has failed to sufficiently explain its withholdings. For the reasons set forth below, the Court finds that the CIA properly invoked Exemption 3 and will therefore grant summary judgment for the defense on this issue.

### A. The CIA Properly Withheld Information Pursuant to the CIA Act.

According to the Shiner Declaration, the CIA only used the CIA Act to withhold "titles, names, identification numbers, and organization information of CIA employees." Shiner Decl. ¶ 33. It is true that information about *how* CIA employees carry out their responsibilities is not covered under the CIA Act, but it does not appear that the CIA used Exemption 3 to redact any such information. The CIA's Vaughn Index and the Shiner Declaration both make it clear that the CIA limited its withholdings under the CIA Act to information about the identities and functions of CIA personnel, which falls squarely within the statute.

### B. The CIA Properly Withheld Information Pursuant to the NSA Act.

The NSA Act exempts from disclosure any material that the agency shows "can reasonably be expected to lead to unauthorized disclosure" of intelligence sources or methods. *Wolf v. Central Intelligence Agency*, 473 F.3d 370, 377 (D.C. Cir. 2007). The Shiner Declaration sufficiently explains that the information withheld is of such a nature. The information that the CIA has withheld consists of internal CIA and intra-agency communications regarding the Kiriakou investigation and prosecution as well as CIA records that would reveal sensitive technical means of conducting counterintelligence operations. As previously noted, courts tend to give great deference to agencies when such interests are at stake, and the Court finds that the CIA has met its obligations here.

## III. Exemption 5

Exemption 5 protects from disclosure documents that are normally privileged in the civil discovery context. 5 U.S.C. § 552(b)(5). Plaintiffs argue that the CIA's explanations for its Exemption 5 withholdings are insufficient. The Court finds that the CIA properly invoked Exemption 5 and will therefore grant summary judgment for the defense on this issue.

8

### A. The CIA Properly Withheld Attorney Work Product.

Exemption 5 permits an agency to withhold documents under the attorney work product doctrine if the documents were prepared in anticipation of litigation. *See FTC v. Boehringer Ingelheim Pharms., Inc.*, 778 F.3d 142, 149 (D.C. Cir. 2015). This involves determining "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010). Even if a document "serves multiple purposes" (including purposes that are not limited to future litigation), it still qualifies as work product so long as it "was prepared because of the prospect of litigation." *Id.* at 138.

The CIA properly withheld attorney work product in this case. The documents that the CIA identified as responsive were found primarily in the CIA's Office of Security and Office of General Counsel ("OGC"). These documents consist of investigatory and/or legal documents, portions of which were compiled by or at the request of OGC and include interview reports, emails reflecting legal advice, case updates, draft memoranda, and feedback on draft reports or recommendations. The CIA knew from the outset of its investigation that any unauthorized disclosure of information was likely to be prosecuted, meaning that the withheld documents were prepared in anticipation of litigation. In the FOIA context, this is sufficient to justify withholding the documents under Exemption 5.

### B. The CIA Properly Invoked the Deliberative Process Privilege.

The deliberative process privilege protects inter-agency and intra-agency documents reflecting "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Loving v. U.S. Dep't of Defense,*

550 F.3d 32, 38 (D.C. Cir. 2008) (citing *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). In this case, the CIA withheld pre-decisional communications that occurred within the CIA as well as between the CIA, FBI, and DOJ. As explained in the Shiner Declaration, the CIA also withheld interview reports, case updates, investigative reports, and memoranda containing recommendations and other deliberations regarding the conduct of the CIA's counterintelligence investigation and whether disciplinary or legal action was warranted.

Plaintiffs specifically challenge the CIA's use of the deliberative process privilege to withhold crime reports from the CIA to DOJ, which contain the CIA's position and recommendation with respect to a possible criminal investigation or prosecution. The D.C. Circuit has held that a document containing a recommendation from one agency to another can fall within the deliberative process privilege. *See Wolfe v. U.S Dep't of Health & Human Servs.*, 839 F.2d 768, 774-75 (D.C. Cir. 1988). As the CIA describes the intra-agency and inter-agency communications that were withheld, they were merely recommendations to the decisionmaker (in this case, DOJ) rather than a final or binding decision of its own, meaning that the deliberative process privilege applies. As explained in the Shiner Declaration, DOJ is not bound by the recommendations of the CIA regarding prosecution, meaning that the CIA's recommendations in this context were not final decisions and were merely advisory. Therefore, the CIA properly invoked the deliberative process privilege.

### C. The CIA Properly Withheld Attorney-Client Communications.

Plaintiffs are concerned that the CIA has conflated the attorney-client privilege with the attorney work product doctrine. As the CIA aptly points out, however, the mere fact that certain material was withheld on multiple grounds does not mean that the CIA conflated the two doctrines; rather, both doctrines apply to the same material, as there is often overlap between the

attorney-client privilege and the work product doctrine. The Court also disagrees with plaintiffs' concern that the CIA has provided insufficient explanation for withholding material on the basis of attorney-client privilege. All three of the Vaughn Index entries that plaintiffs point to clearly involve instances wherein OGC attorneys communicated in confidence with their client regarding the Kiriakou investigation or prosecution. The Court therefore finds that the CIA has met its burden to show that the attorney-client privilege applies to these documents.

**IV. The FBI Properly Invoked Exemption 6 and Exemption 7(C).**

FOIA Exemption 6 permits the government to withhold information about individuals contained in personnel files, medical files, and other similar files. 5 U.S.C. § 552(b)(6). FOIA Exemption 7(C) protects personal information in law enforcement records if its disclosure could reasonably be expected to constitute an invasion of unwarranted personal privacy. 5 U.S.C. § 552(b)(7)(C). The FBI has invoked both Exemption 6 and Exemption 7(C) as grounds for categorically withholding the investigative file on Mr. Kiriakou. Both of these exemptions, however, are subject to a balancing test which renders the exemptions inapplicable if some public interest outweighs the privacy interest.

Mr. Kiriakou has repeatedly claimed that his prosecution was merely a cover allowing the government to retaliate against him for his whistleblowing activities. Plaintiffs concede that the FBI's investigative file was compiled for law enforcement purposes and thus meets the threshold of Exemption 7, but they argue that the public interest in learning more about how the FBI conducted its investigation and determining whether Mr. Kiriakou's claims are true outweighs any countervailing privacy interests that would permit the categorical withholding of responsive records. The government argues that even if there is some public interest in the requested records, it does not outweigh the privacy concerns at issue.

11

The Court believes that the balancing test in this case tips in favor of the government. Although the Court disagrees with the government's characterization of Mr. Kiriakou as a mere low-level employee (specifically during his time as the Chief of Counterterrorism Operations in Pakistan), his privacy interests still outweigh the public interest in the investigative file. The government is correct that the Chief of Counterterrorism Operations in Pakistan is not a public figure on par with the likes of House Majority Leader DeLay, former CIA Director General Patraeus, or former National Security Agency senior executive Drake (all of whom the plaintiffs argue are models for how Mr. Kiriakou's personal information should be treated in this case). The Court finds that Mr. Kiriakou still retains a significant privacy interest in the FBI's investigative file, and although plaintiffs argue that Mr. Kiriakou's interest is diminished because he claims his prosecution was a retaliatory act, that is not the case. Mr. Kiriakou is not the one submitting this FOIA request, nor has he submitted any formal waiver of his privacy rights. He is also not a public figure in the same way that the persons plaintiffs cite were deemed public figures. Therefore, his privacy interests remain intact despite having served as the Chief of Counterterrorism Operations in Pakistan.

Plaintiffs also fail to demonstrate how any public interest in the information outweighs the privacy rights at stake. The fact that the file would provide insight into how the FBI went about investigating the case is clearly insufficient to override the privacy interests at play here. Additionally, although people may be interested in Mr. Kiriakou's claims about government misconduct, plaintiffs need to produce "evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred" before this Court can order the FBI to turn over the investigative file. *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004). Mere speculation is insufficient. As the government aptly points out,

plaintiffs provide no evidence of government misconduct aside from Mr. Kiriakou's previous public statements, for which he, in turn, provided no concrete proof. The Court is in no way making a finding that the government did not commit any misconduct in its prosecution of Mr. Kiriakou; however, plaintiffs have not provided evidence of that misconduct sufficient to warrant release of the investigative file. Essentially, the government has established that disclosing the FBI's investigative file could reasonably be expected to constitute an unwarranted invasion of personal privacy, and plaintiffs have failed to prove that the public's interest in the information outweighs such privacy concerns. Therefore, the FBI need not turn over its investigative file on Mr. Kiriakou, and summary judgment will be granted for the defense on this issue.

**V. The CIA and EOUSA Satisfied Their Segregability Obligations.**

The Court finds that the CIA and EOUSA have released all reasonably segregable nonexempt information. The Court must presume that an agency has "complied with the obligation to disclose reasonably segregable material." *Talbot v. U.S. Dep't of State*, 315 F. Supp. 3d 355, 374 (D.D.C. 2018). In this case, plaintiffs have not rebutted that presumption with "contrary evidence." *Id.* The agencies' respective declarants conducted a line-by-line review of the responsive records and determined that all reasonably segregable nonexempt information was released. *See* Shiner Decl. ¶ 45; Stone Decl. ¶¶ 65-68. Courts frequently find that the government has met its segregability obligations based on these types of sworn statements alone, as an "agency is not required to provide so much detail that the exempt material would effectively be disclosed." *See, e.g., Johnson v. Exec. Office for United States Attys.*, 310 F.3d 771, 776 (D.C. Cir. 2002) (affirming summary judgment based on agency declarant's affirmation that a line-by-line segregability analysis was conducted). The Court therefore finds it unnecessary to conduct an *in camera* review.

## CONCLUSION

Based on the foregoing, the Court will **GRANT** defendants' Motion for Summary Judgment (ECF No. 46).

The Court will **ORDER** judgment in favor of defendants.

A separate Order accompanies this Memorandum Opinion.

Date: 1-15-2020

Royce C. Lamberth
United States District Court Judge